UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA MCPHERSON,

                Plaintiff,                      Case Number 20-13152

v.                                              Honorable David M. Lawson

SUBURBAN ANN ARBOR, LLC,

                Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR REMITTITUR**

      Included in the jury's verdict in favor of the plaintiff on her several claims was an award of $350,000 in punitive damages. The defendant, contending that the award is excessive and violative of its rights under the Due Process Clause, moves to reduce the verdict. Because the evidence supports the jury's verdict, and the award falls within the guidelines mapped out by the Supreme Court's due process jurisprudence, the Court will deny the motion.

I.

      The facts of the case are familiar to the parties and the Court. *See McPherson v. Suburban Ann Arbor, LLC*, 2024 WL 841205, at *1-2 (E.D. Mich. Feb. 28, 2024). To summarize, plaintiff Tina McPherson purchased a used motor vehicle from defendant Suburban Ann Arbor, a licensed new and used car dealer. After the papers were signed — including a purchase contract disclosing certain finance terms — and title was transferred to McPherson, the defendant later attempted to unwind the transaction and compel the plaintiff to accept different financing terms, eventually repossessing the car when she did not accede to the defendant's demands. McPherson sued the car dealership alleging claims under the Fair Credit Reporting Act (FCRA), Equal Credit Opportunity Act (ECOA), Michigan Regulation of Collection Practices Act (MRCPA), Michigan Motor Vehicle Sales Finance Act (MMVSFA), and Michigan Credit Reform Act (MCRA), and

for improper repossession under the Uniform Commercial Code (U.C.C.), and conversion of personal property.

At trial, the jury heard evidence of the contract formation, the interaction between the parties, the defendant's attempt to back out of the deal, the repossession, and the consequent damages to the plaintiff.  The jury returned a verdict for the plaintiff on all of her federal claims under the FCRA and ECOA, and on all her claims under Michigan law, which are the MRCPA, MMVSFA, and MCRA, as well as on her claims for improper repossession under the U.C.C. and conversion of personal property.  The state conversion claim authorized the court to treble the damages, which the Court declined to do.  The federal claims allowed the imposition of punitive damages.  The jury also answered a special interrogatory finding that the defendant's violation of the MRCPA was willful.  It awarded the plaintiff $15,000 in actual damages, answered a special interrogatory fixing the value of the converted property at $23,000, and awarded the plaintiff $350,000 in punitive damages.

Following the decision on certain post-trial motions, the Court entered judgment in favor of the plaintiff in the amount of $394,433.75 on February 28, 2024.  The defendant then filed its motion for remittitur.

## II.

Although the defendant raises several procedural grounds for alteration of the jury verdict — which are meritless and do not warrant much discussion — the core argument presented by the defendant's motion is that the punitive damages award is constitutionally excessive under the rubric of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), where the Court held that awards of punitive damages that result in an excessive multiple over the compensatory damages awarded for the same claims may violate the Due Process Clause.  McPherson responds that a fair

reading of the trial record — which the defendant selectively cites in a misleading way — supports the conclusion that the defendant's conduct was willful, harmful, repetitive, illegal, and worthy of strong deterrence.  She says that the amount of the punitive award is not excessive and falls within the guidelines established by the Supreme Court.

To start, the Court has the authority to reduce a jury's damages verdict, but it should do so "'only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court.'"  *Corbin v. Steak 'n Shake, Inc.*, 861 F. App'x 639, 645 (6th Cir. 2021) (quoting *American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004)).  The Sixth Circuit has counseled that "a trial court should not reduce an award unless it is (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of mistake."  *Ibid.* (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996)).  Conversely, "[i]f there is any credible evidence to support a verdict, it should not be set aside."  *American Trim*, 383 F.3d at 475.

The authority to reduce a damages verdict, of course, includes the power to decrease the amount of punitive damages awarded.  Certain guidelines apply, however.  In *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Court observed that punitive damages exceeding "single digit" multiples of an actual damage award may survive due process scrutiny only in the most exceptional cases.  *Id.* at 582 ("[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.  A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.").  The Court extended that caution in *State Farm Mut. Auto. Ins. Co.*

*v. Campbell*, 538 U.S. 408 (2003), emphasizing that the "jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.  Following suit, the Sixth Circuit explained that "[i]n more extreme cases, where many or all of the reprehensibility factors are satisfied, due process still constrains an ensuing punitive damages award. In those cases, a punitive damages award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.  A higher ratio may be justified where the compensatory damages award is relatively low, yet even then, a nine-to-one ratio between punitive and compensatory damages is likely the outer limit that due process will permit." *Kidis v. Reid*, 976 F.3d 708, 715-16 (6th Cir. 2020) (cleaned up).

In later rulings explicating the rule laid down in *Gore*, the Supreme Court has reiterated the underlying principle that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575).  The Court has "instructed [lower] courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Ibid.* (citing *Gore*, 517 U.S. at 576-77).  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Ibid.*  Accordingly, "[i]t should be presumed a plaintiff has been made whole for [her] injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having

- 4 -

paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Ibid.*

Although the defendant cites Federal Rules of Civil Procedure 50 (governing motions for judgment as a matter of law where "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue") and 59 (governing motions for a new trial) as the bases of its motion, it has not presented any developed legal argument contending either that the evidence was insufficient or so one-sided as to justify judgment as a matter of law in the defendant's favor on any liability element, or that a new trial is warranted based on any legal or procedural infirmity in the trial or return of the verdict. Instead, the defendant's argument focuses on whether the verdict is constitutionally defective under the rubric of *Gore* and its progeny.

The defendant concedes that the reprehensibility of its conduct is "the most important indicium of the reasonableness of a punitive damages award," and it emphasizes that a single *Gore* factor may not be sufficient to sustain the punitive damages award, while the absence of all the factors will cause the award to be "suspect." *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). Despite acknowledging this controlling framework, however, the defendant's argument proceeds contrarily along the lines that only a weighty showing on most or all of the applicable factors can sustain any significant award of punitive damages. That is not the rule established by *Gore* and reiterated in *State Farm*.

In this case, the award of punitive damages is not "suspect" for several reasons.

First, the punitive damage portion of the award, $300,000, represents a multiple of 9.2 over the award of $38,000 in compensatory damages awarded by the jury. The punitive damage verdict therefore, although at the "outer limits" of the acceptable range, does not fall outside the benchmark of "single digit" multiples that typically provoke due process concerns. *Kidis*, 976

F.3d at 715-16 ("[A] nine-to-one ratio between punitive and compensatory damages is likely the outer limit that due process will permit."); *see also State Farm*, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate . . . that, in practice, *few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree*, will satisfy due process.") (emphasis added). Under the prevailing case law, the award here is not categorically suspect based on the multiple alone.

Second, the trial evidence amply sustains several of the factors demonstrating the reprehensibility of the defendant's unlawful conduct. The applicable factors include the nature of the harm (physical versus economic), the defendant's indifference to the health or safety of others, the plaintiff's financial vulnerability, the recidivistic nature of the defendant's actions, and the defendant's intent. *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-577).

The first two *Gore* factors are inapplicable and do not lend weight in favor of the plaintiff since this case does not involve any allegations that the defendant's conduct resulted in either physical harm or that the interference with the plaintiff's statutory rights as a consumer in any way directly precipitated a threat to "health" or "safety" of any person. However, contrary to the defendant's argument, the trial evidence sufficiently establishes the weight of the remaining factors, demonstrating the propriety of the verdict.

First, there was some evidence from which the jury reasonably could infer that the plaintiff had a measure of "financial vulnerability." The plaintiff's husband, Dion McPherson, testified at trial that, after the family's only vehicle was repossessed by the defendant, the plaintiff and her family were forced to scramble on a daily basis cobbling together transportation options, including riding the bus, calling Uber, borrowing other family members' cars, and eventually renting a car for months (at far greater expense compared to the monthly expense of financing the vehicle she

had purchased from the defendant) to ensure that the plaintiff could get to work on time and maintain her employment, which at the time was the sole economic support for the family.  Trial Tr. Vol. II, ECF No. 158, PageID.3513-17; *id.* at PageID.3513 ("[O]nce we didn't have a car, now we're struggling."); *id.* at 3516 ("Q. How'd you make that work? A. Just made it work. Honestly we just made it work. You know, we had no other choice. She had to get to work, so it is what it is.").  Mr. McPherson further testified that without a family car available, they were required sometimes to call an ambulance to ensure timely medical attention for their child who was diabetic, at significantly higher expense than transporting the child to a medical facility using their own vehicle, as they previously had done.  *Id.* at 3518-19.

Second, there was evidence from which the jury reasonably could conclude that the misconduct affecting the plaintiff was not an exception or mere happenstance, but instead represented "business as usual" for the defendant.  Tonia Cramier testified to similar handling of her vehicle purchase from the defendant in 2015, where the defendant's finance and sales staff — the same employees involved in the plaintiff's transaction — harried Cramier repeatedly to renegotiate the financing for her vehicle over a period of 15 weeks after a completed sale, including misrepresenting repeatedly that "alternative financing" had been "approved," only later to claim that "the deal fell through," and accessing Cramier's credit history 68 times, resulting in a significant decrease in her consumer credit score, and eventually repossessing the car approximately three months after the completed sale.  Trial Tr. Vol. III, ECF No. 159, PageID.3567-73.  The defendant's sales associate, Melissa Garner, who was the principal point of contact involved in the plaintiff's sale and attempted "renegotiation" of the financing arrangement, also admitted that she had seen similar deals "unwound" by the defendant on other occasions:

> Q. Is it fair to say that if funding falls through, a consumer might be asked to return to the dealer?

A. Yes.

Q. And you might tell them that they need to sign more documents?

A. When they come in to the dealership we would explain what the situation is.

Q. I'm sorry, I don't think you answered my question. You might tell them that they need to sign more documents?

A. When they come to the dealership, we would explain the situation.

Q. If they don't come to the dealership?

A. Then I would turn everything over to my general manager and then he would make the decision as to what happens from there.

Q. And the things that can happen from there are things like the car might be repossessed?

A. That's totally up to his — that's his decision.

Q. But that's one of the things that can happen, isn't it?

A. It could, yes.

Q. And you have seen that happen before?

A. Yes, I have.

Q. Okay. And that's — that's called unwinding a deal, isn't it?

A. Yes.

Q. And when the deal is unwound, when the deal is unwound, your commission gets unwound as well; correct?

A. Yes.

Q. So you see when that happens; correct?

A. Yes.

Q. Are you aware of the Secretary of State's regulations concerning spot deliveries?

A. I was not aware of them until this started.

Q. But you're aware of them now?

A. I am.

> Q. And, in fact, you understand now that the Secretary of State does not allow dealers to require consumers to come back to a dealership to sign new contracts; correct?
>
> A. I was — I'm aware of that now, yes.

Trial Tr. Vol. I, ECF No. 157, PageID.3302-04.  The defendant's used car sales manager, Mark Fultz, further admitted that when he undertook to repossess a vehicle after a financing deal fell through, he was following "marching orders" dictated by the defendant's routine practice for handling situations where a post-sale financing assignment was refused.  Trial Tr. Vol. II, ECF No. 158, PageID.3476-78 ("Q. Suburban's policy when financing falls through was to either get the customer to sign a new contract or take the vehicle back, right? A. I don't think we have a policy on that. Q. . . . . That's what it is that y'all do when financing falls through, right? A. Yes. . . . Q. You were following your marching orders as directed by the higher-ups at Suburban, right? . . . . [When you contacted Ms. McPherson] [Y]ou were doing what it is you were required to do for Suburban, right? A. Yeah. I guess, yeah.").  That testimony is sufficient to support a finding by the jury that the defendant's conduct in this instance was not merely an anomaly or happenstance but instead a matter of routine.

Third, and perhaps the most significant badge of "reprehensibility," the evidence supports a finding that the defendant's handling of Ms. McPherson's transaction and the resulting transgression of her consumer rights "was the result of intentional malice, trickery, or deceit." *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-577).  The plaintiff testified that Melissa Garner told her at the time of the sale that financing for the vehicle had been "approved" by the third-party financing entity, Ally Financial, Trial Tr. Vol. III, ECF No. 159, PageID.3663, but when the plaintiff called Ally weeks later, when her first payment came due, she was told that Ally never financed the sale, *id.* at 3670.  When the plaintiff called Garner and attempted to make payments directly to the defendant (which she had a right to do under state law), Garner refused

to accept the plaintiff's payments and instead told her that she had arranged a "better deal" with another lender, Dort Federal Credit Union, and that the plaintiff would have to come back to the dealership to execute a new financing contract.  *Ibid.*  But DFCU's representative testified that it never approved any financing for the plaintiff's vehicle, and furthermore that if it was fully informed about the financing terms proposed by the defendant it never would have accepted the financing arrangement.  Furthermore, Garner admitted that she never received financing approval from DFCU.  Trial Tr. Vol. I, ECF No. 157, PageID.3357 ("Q. So the [DFCU] deal that you put in front of her at the time, you did not have approval for that, that contract that you sent to Ms. McPherson, correct? A. Correct.") (testimony by Melissa Garner); Trial Tr. Vol. II, ECF No. 158, PageID.3397 ("Q. [T]he McPherson loan request, that was never processed through Dort Financial, meaning you never funded the deal, right? A. Correct.") (testimony by Johanna Scherzer); *id.* at 3399 ("So if we're exceeding 10 percent [for charges on back-end items], that's going to be a deal that requires review and if it's much over it's going to be rejected.").

Fourth, and most damning of all, the uncontroverted documentary and testimonial evidence at trial amply established — which the defendant frankly admits, and never has disputed throughout this litigation — that its representatives repeatedly insisted that the plaintiff surrender the vehicle or execute a new financing arrangement, falsely represented to the plaintiff that the vehicle still was owned by the defendant, and eventually had the vehicle repossessed by its agent, despite the undisputed facts that a purchase contract fully was executed on the day of the sale, title to the vehicle was registered by the Michigan Secretary of State in the plaintiff's name, the defendant never had any recorded lien or other security interest in the vehicle that would have given it any present right to recover possession of the car, and the defendant had no other extant right under the law to "unwind" the completed sale at its whim.  *See* Mot. Hr'g, ECF No. 103,

PageID.2250-51 ("[T]here is no evidence refuting the clear record showing that Defendant, Suburban, executed and caused to be recorded, a legally valid assignment of a secured interest to Ally Financial. And there is no evidence suggesting that the interest was ever re-conveyed to Suburban. . . . [T]he idea that the contract was breached by the plaintiff refusing to sign a new contract is simply wrong as a matter of law, and the defendant has not cited any legal authority holding that.") (denying summary judgment).

Finally, there is the additional factor in this case that the defendant steadfastly has clung throughout this entire litigation — and to this day — to the position that its unlawful conduct should be excused because it "was not aware" at the time that what it was doing was illegal. Among all first principles of the law, the most basic and esteemed perhaps is that "'ignorance of the law is no defense.'" *United States v. Fortner*, 943 F.3d 1007, 1011 (6th Cir. 2019) (quoting *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971)). The defendant's persistent repudiation of that foundational principle convincingly demonstrates that stronger medicine then mere compensation for the plaintiff's inconvenience (and hardship) is essential to discourage any prospective repetition of the defendant's plainly unlawful conduct.

The defendant also repeatedly argued at trial, and its principals asserted, that it should be given a pass because it offered the plaintiff a "better deal" when it insisted that she consent to unwind the completed vehicle sale. That position, of course, conveniently overlooks the fact that when the plaintiff declined the unlawful demand to make a "new deal," the defendant decided to steal the plaintiff's property to which it had no legal right, rather than sticking with the deal it had struck, as required by law. Again, the defendant's persistence throughout the litigation (and to this day) in clinging to this discredited position, and its persistent refusal to acknowledge the

culpability of its conduct, demonstrates the need for harsh punitive sanctions to rebuke the defendant's unrepentant stance.

III.

Although some of the reprehensibility factors are not present in this case, the proofs sufficiently support a conclusion that several of the factors — not merely one — weigh in favor of a finding that fiscal punishment is justified for the defendant's admittedly unlawful, deliberate, and deceitful misconduct.  The multiple of the punitive damages award relative to the actual damages is not presumptively excessive.  In similar cases, the Sixth Circuit has upheld a "punitive damages award up to $300,000 where it was clear that the jury found that the company did not mitigate [its unlawful conduct] through training and policies."  *Corbin v. Steak 'n Shake, Inc.*, 861 F. App'x 639, 647 (6th Cir. 2021) (citing *Fischer v. United Parcel Service, Inc.*, 390 F. App'x 465 (6th Cir. 2010)).  A similar punitive award is called for in this instance, and the defendant has not established good grounds to upset the jury's award.

Accordingly, it is **ORDERED** that the defendant's motion for remittitur (ECF No. 175) is **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated:  July 31, 2024